# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JOSEPH MICHAEL LUCERO,

      **Plaintiff,**

v.                                **No. CIV-15-0434 LAM**

CAROLYN W. COLVIN, Acting Commissioner
of the Social Security Administration,

      **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Plaintiff's ***Motion to Reverse and Remand for a Rehearing with Supporting Memorandum*** (*Doc. 18*), filed March 7, 2016 (hereinafter "motion"). On May 9, 2016, Defendant filed a response (*Doc. 19*) to Plaintiff's motion and, on May 24, 2016, Plaintiff filed a reply (*Doc.* 20). In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to have the undersigned United States Magistrate Judge conduct all proceedings and enter a final judgment in this case. *See* [*Docs.* 4 and 6]. The Court has considered Plaintiff's motion, Defendant's response, Plaintiff's reply, and the relevant law. Additionally, the Court has meticulously reviewed and considered the entire administrative record. [*Doc. 11*]. For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **DENIED** and the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") should be **AFFIRMED**.

.

# I.   Procedural History

On  August  21,  2013  (*Doc. 11-4*  at 2),  Plaintiff  protectively  filed  an  application  for Disability  Insurance  Benefits  (hereinafter  "DIB"),  alleging  that  he  was  disabled  due  to  bipolar affective  disorder,  anxiety,  and  knee  pain  (*Doc. 11-8*  at 5),  with  a  disability  onset  date  of September 14, 2012 (*id*. at 2).   Plaintiff's' last day of insurance, for DIB purposes, was March 31, 2016.  *Id*.  Plaintiff's application was denied at the initial level on January 7, 2014 (*Doc. 11-5* at 2-5), and at the reconsideration level on February 26, 2014 (*id*. at 7-9).   On March 15, 2014, Plaintiff  requested  a  hearing  to  review  the  denial  of  his  application.   [*Doc. 11-5* at 10-11]. Administrative Law Judge Ann Farris (hereinafter "ALJ") conducted a hearing on January 15, 2015.  [*Doc. 11-3* at 30-59].   At  the  hearing,  Plaintiff  was  present,  represented  by  attorney Ione E. Gutierrez, and testified.  *Id*. at 35-54.   Vocational Expert (hereinafter "VE"), Mary Diane Weber, also testified.   *Id*. at 54-59.

On February 3, 2015, the ALJ issued her decision (*Doc. 11-3* at 17-26) finding that, under the relevant sections of the Social Security Act, Plaintiff was not disabled from his alleged onset date of September 14, 2012 through the date of the decision (*id*. at 26).   Plaintiff requested that the  Appeals  Council  review  the  ALJ's  decision.   [*Doc. 11-3* at 12].   On March 30, 2015, the Appeals Council denied Plaintiff's request for review on the ground that there was "no reason under our rules to review the [ALJ]'s decision."  *Id*. at 7.   This decision was the final decision of the Commissioner.   On May 22, 2015, Plaintiff filed his complaint in this case.   [*Doc. 1*].

# II.   Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied.

*Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted); *Doyal*, 331 F.3d at 760 (citation and quotation marks omitted). An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted). While a court may not re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citations omitted). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

### III.   Applicable Law and Sequential Evaluation Process

For purposes of DIB, a person establishes a disability when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 405.1505(a).   In light of this definition for disability, a five-step sequential evaluation process (hereinafter "SEP") has been established for evaluating a disability claim. 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).   At the first four steps of the SEP, the claimant has the burden to show that: (1) the claimant is not engaged in "substantial gainful activity;" and (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) the claimant's impairment(s) meet(s) or equal(s) one of the "Listings" of presumptively disabling impairments; or (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. § 404.1520(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261.   At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his or her residual functional capacity (hereinafter "RFC"), age, education, and work experience.   *Grogan*, 399 F.3d at 1261.

# IV.   Plaintiff's Age, Education, Work Experience, and Medical History; and the ALJ's Decision

Plaintiff, a veteran, was born on March 17, 1977, and was 35 years old on September 14, 2012, the alleged onset date of his disability.   [*Doc. 11-8* at 2].   Thus, for the purposes of his disability claim, Plaintiff is considered to be a "younger person."[1]   Plaintiff stated that the highest level of school he had completed was 12th grade in 1995.   *Id*. at 6.   Prior to his alleged onset of disability, Plaintiff worked as an automobile salesman (May-September, 2012), a material handler in manufacturing (January 2008-September 2010), a purchasing coordinator for a construction company (May-September 2007), an operations manager for a moving and storage company (January 2002-May 2007), and as a coordinator/lead supervisor for a manufacturing company (December 1999-June 2001).   *Id*.   Prior to these jobs, Plaintiff served in the Marine Corps, beginning in 1995.   [*Doc. 11-3* at 39-40; *Doc. 11-7* at 13].

Plaintiff's medical records include:   treatment notes from John A. Johnson, M.D. of Saint Alphonsus Medical Group in Nampa, Idaho, for the period from December 18, 2009 to July 22, 2010 (*Doc. 11-9* at 7-14); treatment records, laboratory results, and psychiatric treatment notes from the Veteran's Administration (hereinafter "VA") Healthcare System in Albuquerque, New Mexico, for the period from May 17, 2011 to October 29, 2014 (*Doc. 11-10* at 2 through *Doc. 11-12* at 17; *Doc. 11-14* at 2-41); and treatment records and laboratory results from the VA Healthcare System in Boise, Idaho, for the period from July 15, 2011 to November 13, 2013

---

[1]  *See* 20 C.F.R. § 404.1563(c) (defining a "younger person" as "under age 50").

(*Doc. 11-13* at 2-38).   Where relevant, Plaintiff's medical records are discussed in more detail below.

At step one of the five-step evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity after September 14, 2012.   [*Doc. 11-3* at 19].   At step two, the ALJ found that Plaintiff "has the following severe impairments:   mood disorder and anxiety disorder."   *Id*.   The ALJ also found that Plaintiff has "substance abuse disorder and osteoarthritis," but that both of those impairments are non-severe.   *Id*.   At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the Listings found in 20 C.F.R.  Part 404,  Subpt. P, Appx. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).   *Id.* at 20.   In so concluding, the ALJ considered Listings 12.04 Affective Disorders, 12.06 Anxiety Related Disorders, and 12.09 Substance Addiction Disorders.   *Id.* at 20-21.   Before step four, the ALJ found that Plaintiff had the RFC "to perform a full range of work at all exertional levels but with the following non[-]exertional limitations:   he is limited to simple workplace decisions with few workplace changes; should have only occasional and superficial contact with co-workers; and should have no contact with the general public."   *Id.* at 21.   In support of this RFC assessment, the ALJ found that Plaintiff's "medically determinable impairments might be expected to cause some of the alleged symptoms; however, [Plaintiff]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."   *Id.* at 22.

At step four, the ALJ found that Plaintiff "was unable to perform any past relevant work," as Plaintiff's previous jobs of auto sales, shipping and receiving clerk, and operations manager all

were considered "skilled and require a SVP[2] of 5 or higher."   *Id*. at 25.   At step five, the ALJ found that jobs exist in significant numbers in the national economy that Plaintiff can perform, including the representative jobs of addresser in an office setting (DOT 209.587-010),[3] a sedentary, unskilled position; warehouse checker (DOT 222.687-010), a light, unskilled position; and hospital cleaner (DOT 323.687-010), a medium, unskilled position.   *Id*. at 25-26.   All three of these jobs are designated at SVP level 2.[4]   Therefore, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act from September 14, 2012 through the date of the decision.   *Id*.

## V.   Analysis

Plaintiff argues in his motion that, contrary to Soc. Sec. Rep. 96-6p and Tenth Circuit precedent, the ALJ failed to either incorporate all of the limitations found by non-examining medical experts Scott R. Walker, M.D., at the initial review level (*Doc. 11-4* at 9-11) and Susan B. Cave, Ph.D.[5] at the reconsideration level (*id*. at 23-25), into Plaintiff's RFC, or to explain why some of those limitations were not included.   (*Doc. 18* at 12-16).   In response, Defendant asserts

---

[2] "SVP" stands for Specific Vocational Preparation, which is a rating of the amount of time it takes "a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."   Dictionary of Occupational Titles (4th ed., rev. 1991), App. C(II), 1991 WL 688702.

[3] "DOT" stands for Dictionary of Occupational Titles.

[4] SVP 2 jobs require preparation that is more than a short demonstration but only up to, and including, a month.

[5] Since Dr. Cave simply affirmed Dr. Walker's mental RFC and included his findings verbatim, this Court deems it unnecessary to discuss her findings or opinion separately.

that the ALJ's decision is both supported by substantial evidence and legally sound, because the ALJ:  (1) "reasonably evaluated" the medical opinions, and (2) "reasonably relied on the vocational expert's testimony."  [*Doc.19* at 2].  In his reply, Plaintiff asserts that twelve moderate limitations found by the medical experts were not adequately described or included in Section III of the doctors' opinions, and also were not included in the hypothetical provided to the VE.  [*Doc. 20*].

As already noted, Plaintiff has the burden at steps one through four of the SEP, which means he must establish that he has a severe medically determinable impairment, or combination of impairments, and that either his impairments meet or equal a listed, presumptively disabling, impairment, or that he is unable to perform his past relevant work.  Here, the ALJ found that Plaintiff suffers from two severe impairments -- mood disorder and anxiety disorder.[6]

Plaintiff's sole argument in this appeal is that the ALJ's RFC is legally insufficient because she did not specifically address every work function that Dr. Walker indicated was "moderately limited."  Essentially, Plaintiff asserts that both the consulting medical experts and the ALJ must indicate why they either accepted or rejected each of the Section I work function limitations in the Mental RFC Assessment (hereinafter "MRFCA") form.[7]  The initial problem with this position is

---

[6] Although Plaintiff claimed to be disabled due to knee pain as well, the ALJ determined that impairment to be non-severe.   Since Plaintiff did not contest that finding in his appeal, this Court will not address it.

[7] Appropriate use and consideration of the MRFCA form (SSA-4734-F4-SUP) has been discussed many times by the Tenth Circuit Court of Appeals.  *See, e.g., Nelson v. Colvin*, __ F. App'x __, 2016 WL 3865856 (10th Cir. July 12, 2016) (unpublished); *Lee v. Colvin*, 631 F. App'x 538 (10th Cir. November 12, 2015) (unpublished); *Sullivan v. Colvin,* 519 F. App'x 985 (10th Cir. March 13, 2013) (unpublished).  *See also* POMS DI

that it assumes that Dr. Walker, who neither treated nor examined Plaintiff, and reached whatever

conclusions he did based solely on record evidence, in fact endorsed each of those "moderately

limited" functions as an accurate assessment of Plaintiff's work performance potential.   In fact,

however, the only subsection of functionality that Dr. Walker did not expressly minimize was the

understanding and memory limitation section, in which he indicated that Plaintiff had no such

limitation, stating in the narrative summary for that function that "[a]ll exams [of Plaintiff] opine

cognition intact."   [*Doc. 11-4* at 10].   In his summary of Plaintiff's "sustained concentration and

persistence limitations," Dr. Walker wrote: "Self[-]reported short attention span.   Not reported by

[treat]ing sources."   *Id*.   Similarly, regarding "social interaction limitations," Dr. Walker noted

that "[Plaintiff] and [girlfriend] describe severe disturbance of behavior.   [Treat]ing sources only

note delusional jealous[y] of [girlfriend] in context of increased heavy [marijuana] use and

discontinuing medications which he reportedly was stable on for years."   *Id*. at 11.   Finally,

regarding Plaintiff's "adaptation limitations," Dr. Walker again indicated "[s]elf[-]reported

limitations."   *Id*.   Each of these statements indicates that, although Dr. Walker noted the

---

24510.060, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510060 (site last visited August 17, 2016).
Although the form filled out by Dr. Walker is similar to the official MFRCA form, it is not identical, and thus the
official form sections must be inferred.   Section I of the official form, "Summary Conclusions," lists twenty work
functions in the following four categories:   A. Understanding and Memory; B. Sustained Concentration and
Persistence; C. Social Interaction; and D. Adaptation.   Section I is the "worksheet" of the form, in which the evaluator
rates all twenty functions as either not significantly, moderately, or markedly limited, or indicates either that there is
no evidence of a limitation or that no rating can be made on the available evidence.   Section II is specifically limited
to any functions that cannot be rated on the evidence available, and requires the evaluator to indicate what additional
documentation is needed.   Section III is where the evaluator explains his or her summary conclusions in narrative
form.   POMS DI 25020.010, available at http://policy.ssa.gov/poms.nsf/lnx/0425020010 (site last visited August 17,
2016).   Unlike the official form, the form used by Dr. Walker calls for narrative entries after each of the four function
categories, in addition to the final summary narrative.   *See* [*Doc. 11-4* at 9-11].

limitations Plaintiff claimed to have, he was unwilling to unqualifiedly endorse them.   Thus, in

the "MRFC – Additional Explanation" section, Dr. Walker stated his own opinions, as follows:

> The credibility of the allegations is unclear.   Per [treat]ing sources [Plaintiff]
> tapered off of effective medications and started smoking Marijuana more heavily
> with resultant delusional jealousy.   Most recent notes indicate [n]ow on a
> medication with great benefit and Psychiatrist questions prior [diagnosis] of
> Bipolar [disorder].
>
> He may indeed require a work setting with limited contact with the general public.
>
> [Plaintiff] can understand, remember and carry out detailed but not complex
> instructions, make decisions, attend and concentrate for two hours at a time,
> interact adequately with co-workers and supervisors and respond appropriately to
> changes in a work setting.

*Id*.   This RFC adequately describes Dr. Walker's findings in the worksheet portion of his

MRFCA, especially considering his reluctance to give full credence to the symptoms described by

Plaintiff and his girlfriend that lacked support in Plaintiff's medical records.   Dr. Walker's

narrative opinion, in which he did limit Plaintiff's social contact and his capacity to follow

instructions, was adopted in a slightly more restrictive form by the ALJ in her RFC, which

restricted Plaintiff to "unskilled" work.[8]

Plaintiff's argument, that the failure of Dr. Walker and the ALJ to specifically discuss each

of his "moderate" limitations in their RFC requires remand, has been rejected on more than one

occasion.   Thus, the Tenth Circuit recently held that an ALJ "can account for moderate limitations

by limiting the claimant to particular kinds of work activity."   *Smith v. Colvin*, 821 F.3d 1264,

---

[8] Unskilled work generally has a designated SVP of 1 or 2.  POMS-DI-25001.00-B-88  https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001#b88 (site last visited August 17, 2016).

1269 (10th Cir. 2016), citing *Vigil v. Colvin*, 805 F.3d 1199, 1204 (10th Cir. 2015).   In *Vigil*, the

court held that "limiting the plaintiff to an SVP of only one or two, adequately took into account

his moderate limitations in concentration, persistence, and pace problems," noting:

> Unskilled work generally requires only the following: (1) "[u]nderstanding,
> remembering, and carrying out simple instructions"; (2) "[m]aking judgments that
> are commensurate with the functions of unskilled work—i.e., simple work-related
> decisions"; (3) "[r]esponding appropriately to supervision, co-workers and usual
> work situations"; and (4) "[d]ealing with changes in a routine work setting." SSR
> 96–9p, 1996 WL 374185, at *9 (July 2, 1996).

*Vigil*, 805 F.3d at 1204.   In addition, the Tenth Circuit recently addressed an argument almost

identical to Plaintiff's in this case, which was "that the ALJ didn't explain why the RFC failed to

capture two moderate limitations from [a non-examining psychologist]'s opinion" that related to

the plaintiff's "ability to sustain an ordinary routine without special supervision, and to accept

instructions and respond appropriately to criticism from supervisors."   *Chavez v. Colvin*,

No. 15-2201, 2016 WL 3212479, at *1 (10th Cir. June 2, 2016) (unpublished).   The appellate

court rejected the suggested formulistic approach and approved the ALJ's more general RFC,

stating:

> While the ALJ didn't parrot [the psychologist]'s exact descriptions of [plaintiff]'s
> limitations, the ALJ did specifically note his overall assessment that [plaintiff]
> "retain[ed] the capacity to do simple tasks."   And we find it hard to fault the ALJ
> for finding, consistent with [the psychologist]'s opinion, that [plaintiff] should be
> "limited to simple work-related decisions with few workplace changes," "no
> interaction with the public, and only occasional and superficial contact with
> co-workers."

*Id.*  In the present case, not only did the ALJ *increase* Plaintiff's RFC restrictions from those stated by Dr. Walker,[9] it is also clear that even Dr. Walker himself did not fully endorse the accuracy of all of the limitations he reported.[10]

Plaintiff cites *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007) as support for his assertion that the ALJ engaged in reversible "picking and choosing" of only the evidence that supported her finding of no disability, because she did not explicitly accept or reject each of the moderate limitations in Dr. Walker's "Section I" analysis.[11]   However, the Tenth Circuit has held that *Haga* is inapposite when the ALJ's RFC assessment does not conflict with the medical expert's Section III opinions.   *Sullivan v. Colvin*, 519 F. App'x 985, 988 (10th Cir. 2013) (unpublished). Specifically, the court concluded that the ALJ's RFC, which limited the plaintiff to "unskilled,

---

[9] Specifically, the ALJ's RFC limited Plaintiff's contact with co-workers to "only occasional and superficial contact," while Dr. Walker indicated that Plaintiff could "adequately" interact with co-workers.   The ALJ also more severely restricted Plaintiff's contact with the public (revising Dr. Walker's "limited contact" to "no contact"), and limited Plaintiff to "simple workplace decisions and few workplace changes," although Dr. Walker did not limit Plaintiff's decision-making and stated that he could "respond appropriately" to workplace changes.   However, Dr. Walker indicated that Plaintiff could "understand, remember and carry out detailed but not complex instructions," while the ALJ did not specifically address instructions, but such a limitation does not appear to be consistent with Dr. Walker's Section I observation that Plaintiff's "cognition" was reportedly "intact."   *Compare* [*Doc.11-3* at 21] with [*Doc. 11-4* at 11].

[10] This Court does not mean to suggest that it is an appropriate practice to fill-in MRFC Section I function ratings to reflect the patient's self-reported claims and then indicate in the narrative that those claims are not entirely credible.   In fact, the agency's own description of the MRFC form specifically states that Section I "is designed to record the [*Medical Consultant*]'s analysis of the evidence and *his/her* conclusions" (emphasis added). *See* POMS DI 24510.060.B.2 available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510060 (site last visited August 17, 2016).   However, that POMS provision also emphasizes that "**Section I is merely a worksheet** . . . and **does not constitute the RFC assessment**."   *Id.*   Additionally, it is worth repeating that the mental RFC in this case was not presented on the standard MRFC (SSA-4734-F4-SUP) form.   *See* n.7, *supra*.

[11] This argument ignores the fact that Dr. Walker's verbatim opinion provided the basis for both the initial and reconsideration conclusions that Plaintiff is not disabled.

supervised work with no regular public contact[,] adequately addressed [the doctor]'s medical opinion that [plaintiff]'s gross mental status is within normal limits but that she is unable to tolerate stress due to her probable borderline personality disorder." *Id*. at 989.   The court further rejected the argument that an ALJ's RFC assessment "is flawed" where it fails to address moderate limitations listed in Section I of the MRFC form, stating that the "actual mental RFC assessment" is contained in Section III, which is where Section I conclusions are explained "in terms of the extent to which these mental capacities or functions could or could not be performed in work settings." *Id*. at 989.   The court concluded that the ALJ had accepted the state agency doctor's "ultimate opinion that, with all of the moderate limitations, [plaintiff] could perform unskilled work." *Id*. at 989.   Emphasizing that "[w]e have repeatedly held that while an ALJ must consider all of the evidence in the record, nothing requires the discussion of every piece of evidence," the court found no error by the ALJ. *Id*. (citing *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996)).

    In any event, a step four determination of the limitations imposed by an impairment that was found to be "severe" in step two of the SEP is a factual issue on which Plaintiff bears the burden of proof, and on which this Court has limited review authority. *See, e.g., Lax*, 489 F.3d at 1084 (reviewing court "may not 'displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice'") (quoting *Zoltanski*, 372 F.3d at 1200).   In this case, not one treating doctor rendered an opinion regarding the limiting effects of Plaintiff's mood and anxiety disorders, leaving the ALJ with only Dr. Walker's MRFCA (adopted by Dr. Cave, as well) as medical opinion evidence of Plaintiff's mental condition.   This Court must reiterate that, where substantial evidence supports the ALJ's findings and the correct

legal standards were applied, the Commissioner's decision stands, and the plaintiff is entitled to no relief.   *See Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214; *Doyal*, 31 F.3d at 760. Moreover, "[i]n reviewing the ALJ's decision, we neither reweigh the evidence nor substitute our judgment for that of the agency."   *Newbold v. Colvin*, 718 F.3d 1257, 1262 (10th Cir.2013) (internal quotation marks omitted).   "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . It is more than a scintilla, but less than a preponderance."   *Id*. (citing *Lax*, 489 F.3d at 1084) (internal quotation marks omitted).   Finally, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence."   *Lax*, 489 F.3d at 1084 (citing *Zoltanski*, 372 F.3d at 1200).   Applying these principles, this Court cannot conclude from the record that the ALJ's view that "the medical records reveal that the medications have been relatively effective in controlling [Plaintiff]'s symptoms," and that "with proper medications, Plaintiff improved . . . and his symptoms stabilized" (*Doc. 11-3* at 23) (citing *Doc. 11-11* at 17; *Doc. 11-14* at 7, 12, 15-41) is not supported by substantial evidence.

Although Plaintiff asserts in his motion that he "has suffered from anxiety attacks since at least 2002, when he was diagnosed with panic disorder" (*Doc. 18* at 6), the earliest medical reports that are in the record are dated December 18, 2009, when Plaintiff was seeking a primary care doctor to refill his medications and was seen by John A. Johnson, M.D. in Nampa, Idaho (*Doc. 11-9* at 13-14).   Since Plaintiff listed depression and anxiety as reasons why he needed an

appointment, Dr. Johnson used a depression screening test called the PHQ-9.[12]   Plaintiff's score

of 12 fell in the "moderate depression" range.   Based on a history obtained from Plaintiff,

Dr. Johnson assessed Plaintiff with "Bipolar affective disorder, mixed," and gave him new

prescriptions for clonazepam[13] and Depakote,[14] both of which he was taking already.   *Id*. at 14.

In January 2010, Plaintiff was "doing well and without complaints," his mood was stable, his

concentration was normal, and he had no sleep disturbance.   *Id*. at 10.   Dr. Johnson revised his

previous diagnostic assessment to "Major depression NOS," and indicated that he "[wo]uld like

[Plaintiff] [to] be seen for consideration of changing from [D]epakote to another agent."   *Id*. at 11.

At his six-month follow-up appointment in July 2010, Plaintiff was again noted to be doing well

without complaints, and received a PHQ-9 score of 5, which indicates mild depression.   *Id*. at 7.

---

[12] The PHQ-9 (Patient Health Questionnaire 9) is a nine-item scale that is self-administered and is used to screen patients for depression.   "It is one of the most validated tools in mental health and can be a powerful tool to assist clinicians with diagnosing depression and monitoring treatment response. The nine items of the PHQ-9 are based directly on the nine diagnostic criteria for major depressive disorder in the DSM-IV." https://aims.uw.edu/resource-library/phq-9-depression-scale (site last visited August 17, 2016).   The test itself provides the following total score interpretations: 0-4 indicates minimal depression; 5-9 indicates mild depression; 10-14 indicates moderate depression; 15-19 indicates moderately severe depression; and 20-27 indicates severe depression.   PHQ9 Copyright © Pfizer Inc.

[13] "Clonazepam (brand name Klonopin) is a drug used to relieve panic attacks.   Clonazepam is in a class of medications called benzodiazepines, which are central nervous system depressants.   It works by decreasing abnormal electrical activity in the brain.   https://medlineplus.gov/druginfo/meds/a682279.html (site last visited August 17, 2016).  A similar, but not as long-acting, benzodiazepine is the more widely-known drug, Xanax.  http://www.health line.com/health/mental-health/clonazepam-vs-xanax#Comparison2 (site last visited August 17, 2016).

[14] Depakote (generic name valproic acid or divalproex sodium) "is used alone or with other medications to treat certain types of seizures.   It is also used to treat mania (episodes of frenzied, abnormally excited mood) in people with bipolar disorder."   Depakote may cause serious or life-threatening damage to the liver or pancreas, and requires periodic blood tests to ensure that the patient is not suffering adverse effects to its use.  https://medlineplus.gov/drugi nfo/meds/a682412.html (site last visited August 17, 2016).

Other than prescription refills for Klonopin and Depakote, there are no medical records for Plaintiff from July 2010 through April 2011.  In May 2011, Plaintiff went to the Emergency Department of the Albuquerque VA[15] for "[b]ody aches and swelling" (*Doc. 11-12* at 11), was diagnosed with "[r]heumatologic disorder, unspecified," and was sent home with pain meds (*id*. at 14).  His psychiatric condition was apparently not an issue at that time.  Although Plaintiff's employment in auto sales terminated on September 14, 2012, which is when he alleges his disability began, he has no significant medical records from this May 2011 visit to July 19, 2013, when he was again seen at the Albuquerque VA.  At that time, Plaintiff was treated for a back abscess with mild cellulitis.  [*Doc. 11-11* at -37; *Doc. 11-12* at 2-8].  Ten days later, on July 29, 2013, Plaintiff returned to the Albuquerque VA to request reorders of his previous Klonopin and Depakote prescriptions, which were discontinued by his Idaho doctor when Plaintiff moved to Albuquerque.  [*Doc. 11-11* at 36-37].  At this visit, Plaintiff denied having "any chronic medical problems," any side effects from his Klonopin and Depakote, and any suicidal or homicidal ideations.  *Id*. at 37.  On August 8, 2013, Plaintiff again denied any symptoms to psychiatrist Gladys A. Richardson, M.D., and reported that he felt "fine when I have my medication."  *Id*. at 33-34.  Dr. Richardson recommended a "taper off of [Klonopin]," and indicated that Plaintiff "decline[d] therapy referral at this time."  *Id*. at 35.  On August 20, 2013, during an initial

---

[15] These records indicate that Plaintiff moved to Albuquerque from Idaho in April 2011.  However, he apparently returned to Idaho shortly thereafter, as his employment records indicate that he received unemployment benefits in the first and second quarters of 2012 in Nampa, Idaho (*Doc. 11-7* at 11), and his own account shows a gap in employment between September 2010 and May 2012, which is when he began working in auto sales (*Doc. 11-8* at 15-16).

evaluation for primary care, Plaintiff reported to Dennis E. Walker, M.D.[16] that he wakes with panic attacks if he is without his Klonopin.[17]  *Id.* at 28.   Dr. Walker noted only knee pain and anxiety as symptoms at that visit.   *Id.* at 30.   Regarding his reported anxiety, Dr. Walker recommended that Plaintiff follow-up with Beacon[18] in order to continue the discussion regarding his medications, noting that "Psychiatry" had recommended that he be weaned off of Klonopin. *Id.* at 32.

On September 11, 2013, Plaintiff appeared at the Beacon Behavioral Health Clinic "in [a] decompensated state."   [*Doc. 11-11* at 20].   Plaintiff indicated that he was suffering from anxiety and panic attacks, racing thoughts, decreased sleep, loss of appetite, irritability, and mood instability.   *Id.*   His girlfriend, Stephanie, reported that he had threatened to commit suicide and that he was delusional about her cheating on him.   *Id.*   Although she initially wanted Plaintiff admitted to the hospital, Stephanie agreed to supervise him at home overnight, with the addition of a new medication, and to return to the clinic with him in the morning.   *Id.* at 21.   At this time, the

---

[16] Dr. Dennis Walker, one of Plaintiff's treating physicians, should not be confused with consultative expert Dr. Scott Walker.

[17] Interestingly, during this visit, Plaintiff reported to Dr. Walker that he had "last used Marijuana in 1999." [*Doc. 11-11* at 29].   Slightly more than a month later, Plaintiff reported to Nurse Practitioner Patricia Atherton that he had used Marijuana on a daily basis for eight months prior to September 2013.   *Id.* at 9-10.   Finally, in July 2014, Plaintiff reported to his psychiatrist, Adam J Tabet, M.D., that he used Marijuana daily for 1-2 years prior to September 2013.   [*Doc. 11-14* at 19].

[18] Beacon is a team of psychiatric professionals that handles psychiatric emergencies and psychiatric walk-in needs at the New Mexico VA.   http://www.albuquerque.va.gov/docs/Southwest%20Consortium%20Internship.docx (site last visited August 17, 2016).

Beacon doctors added Zyprexa[19] to Plaintiff's medications, intending for it to improve Plaintiff's symptoms of psychosis, agitation, anxiety, and sleep disruption.   *Id*. at 23.   When Plaintiff returned to the Beacon clinic the following morning, he reported that he was "doing much better" after having slept for twelve hours, and that he was "much less anxious and paranoid."   *Id*. at 17. Stephanie described him as "a different person."   *Id*.   Dr. Alicia M. Burbano, who had treated Plaintiff the preceding day, noted that Plaintiff's "[s]ymptoms may be exacerbated by recent marijuana use," but that "Zyprexa is currently useful" and would be continued.   *Id*. at 19. Plaintiff was referred for "regular psychiatric care and medication management."   *Id*. at 20.

Plaintiff was next seen by Nurse Practitioner Patricia Atherton on September 24, 2013 for a mental health diagnostic study.   During this visit, Plaintiff completed a PHQ-9 assessment and received a score of 7, which indicates "mild depression."[20]   *Id*. at 6-8.   Plaintiff also scored a 22 on the Beck Depression Inventory II, which indicates moderate depression.[21]   *Id*. at 15-16. During this visit, Plaintiff reported that his last panic attack had been three weeks before, he had

_____

[19] Zyprexa (generic name olanzapine) is an anti-psychotic used for, among other things, bipolar disorder. Prolonged usage of this drug may increase the possibility of developing tardive dyskinesia (involuntary movements of the mouth, tongue, jaw or eyelids).   http://www.medicinenet.com/olanzapine/article.htm (site last visited on August 17, 2016).  Plaintiff was screened for symptoms of tardive dyskinesia on at least three occasions after he began taking Zyprexa; on September 24, 2013 (*Doc. 11-11* at 8), on April 3, 2014 (*Doc. 11-14* at 30-31) and on October 29, 2014 (*id*. at 16-17).   All three times, Plaintiff received a score of zero, indicating that he did not have symptoms of the disorder.

[20] PHQ-9 scores from 5-9 indicate mild depression.   *See* n.12, *supra*.

[21] The Beck Depression Inventory II is a "[w]idely used indicator of the severity of depression," consisting of 21 self-reported multiple-choice questions.   Scores of 20-28 indicate moderate depression.   http://www.psychcongress.com/saundras-corner/scales-screenersdepression/beck-depression-inventory-ii-bdi-ii (site last visited on August 17, 2016).

stopped using marijuana, he walks and works out in the morning (*id*. at 10), and his mood was "good" (*id*. at 14).   He denied having a depressed mood, trouble sleeping or eating, delusions or hallucinations, anxiety (on his current medications) (*id*. at 10), and suicidal ideation (*id*. at 14). Ms. Atherton described him as neatly groomed and having cooperative/calm behavior, linear and logical thought processes, and fair insight and judgment, but noted he still suspected his girlfriend of cheating on him.   *Id*.   He was assessed with mood disorder, not otherwise specified, and was advised to take his medications as prescribed (*id*. at 5), as well as to continue abstaining from marijuana usage (*id*. at 15).   Based on Ms. Atherton's assessment, Plaintiff was assigned to Adam J. Tabet, M.D. for further psychiatric treatment.   *Id*. at 6.

Dr. Tabet saw Plaintiff on October 9, 2013 and diagnosed him with "mood [disorder] NOS, marijuana induced suspiciousness."   *Id*. at 3.   Dr. Tabet recommended that no changes be made to Plaintiff's medications, but that a slow taper of Zyprexa be considered.   *Id*.   He summarized his findings as follows:

> [Patient] with [history of] prior [treatment] for mood [symptoms] ([Depakote and Klonopin for] years), with move [from Idaho,] more and heavy [marijuana] use[.] [D]eveloped suspiciousness and described mood [symptoms] with Beacon visit 9/11/13.  Has since done well with addition of [Zyprexa].  Diagnosis unclear, doesn't seem to meet full bipolar disorder or psychotic [diagnosis].

*Id*. at 2.   One month later, on a follow-up visit, Dr. Tabet considered Plaintiff's progress to be stable, noting that he had reported "doing much better" and that his "medication is going well, [and] feels since he's been on it for a while [it] is taking good effect."   [*Doc. 11-14* at 12]. Plaintiff was again described as dressing appropriately, having good grooming and hygiene, collaborative behavior, and appropriate affect, that his thought process displayed good

organization, and he showed good alertness and memory, though memory had not been tested. *Id*.

In December 2013, Plaintiff visited the psychiatric clinic because his Klonopin had not been delivered as expected and he hoped to get a partial refill.   *Id*. at 8.   When asked why he had recently asked to move up his next appointment with Dr. Tabet, Plaintiff explained that "he had been forgetting his [Depakote] after[noon] doses[,] and when he became irritable and angry his girlfriend asked him to see Dr. Tabet."   *Id*.   Instead, Plaintiff "began taking all [Depakote] doses and states he is fine now."   *Id*.   He was noted to be dressed "with care to grooming/hygiene," to have eye contact and speech within normal limits, and thought process that was logical, linear, and coherent.   *Id*.

In January 2014, Dr. Tabet noted that Plaintiff "remain[ed] on stable trend with current [medications]."   *Id*. at 7.   Plaintiff was described as very polite/friendly, with appropriate/stylish clothing, good grooming/hygiene, appropriate affect, and organized thought process.   *Id*. at 6-7. In February 2014, Plaintiff was seen by Cynthia Sontag, a licensed social worker, for individual counseling.   Ms. Sontag described Plaintiff at this initial meeting with her as calm and collected, with spontaneous, clear, and fluent speech, and linear thought processes.   *Id*. at 4.   At this session, Plaintiff told Ms. Sontag both that he did not think he could get a job "because he has a felony (possession with the intent to sell marijuana 5[pounds])," and that he had been unable to keep a job "because of his mood swings."   *Id*. at 3.   At Plaintiff's next visit, approximately three

weeks later, Ms. Sontag described him as "attentive and engaged" and, again, with "spontaneous, clear, and fluent" speech, and "linear" thought process.[22]  *Id*. at 37.   Significantly, Ms. Sontag also noted that Plaintiff "feels like a victim, but 'wants' to stay in this position," and "is possessive of his [girlfriend] so she won't leave him and will continue to financially support him."  *Id*. at 36.  Plaintiff indicated to Ms. Sontag that "[h]e wants to go back to [his] previous [girlfriend], but she wouldn't be able to financially support him," and "[h]e isn't ready to commit to getting or keeping a job at this time."  *Id*.   Plaintiff was, however, "willing to work on relationship issues," as well as "past issues related to substance abuse and felony because of it."  *Id*.

On March 12, 2014, Ms. Sontag noted that, in her session with Plaintiff, "we discussed his lack of motivation to get work or have his own life outside of his [girlfriend]" and that they were "focusing only on motivation for awhile and avoiding the focus on the [girlfriend], which is what puts him into depressed dependent state emotionally when discussed."  *Id*. at 35.   In this session,

_____

[22] The Court notes that every one of Ms. Sontag's progress notes includes spaces at the beginning for the entry of visit date, length of session, and diagnosis, and that all but the initial progress note from February 3, 2014 contain a space for entry of a GAF (global assessment of functioning) score.  *See* [*Doc. 11-14* at 20, 22, 24, 25, 27, 34, 36, and 38].   The GAF is a 100-point scale that is intended to reflect a clinician's judgment of an individual's psychological, social, and occupational functioning.   In all seven of Ms. Sontag's progress notes that included a GAF score, the score given was 45.   A score in the range from 41-50 indicates "[s]erious symptoms" such as "suicidal ideation, severe obsessional rituals, [or] frequent shoplifting," or "serious impairment in social occupational or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34.   This level of impairment is in no way supported by Ms. Sontag's detailed descriptions of Plaintiff's functioning.   Additionally, the Tenth Circuit has noted that "[t]he most recent edition of the DSM omits the GAF scale" for reasons that include "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *Richards v. Colvin*, No. 15-6121, 2016 WL 556745, at *4 (10th Cir. Feb. 12, 2016).   Although GAF scores may be helpful in formulating a claimant's RFC, they are not "essential."  *Id*.   In her decision, the ALJ discussed Plaintiff's GAF scores (though not specifically the ones given by Ms. Sontag) and gave them "little weight," noting that "[GAF] scores are not a direct reflection of a claimant's ability to work.  [*Doc. 11-3* at 24].   In this case, the Court views the Plaintiff's GAF scores to be generally inconsistent with the reports of his actual symptoms and functioning, and therefore not relevant to his RFC.

Plaintiff claimed, for the first time,[23] that his medications were making him "feel numb, fuzzy, and his memory is poor." *Id*. at 34.   On the same day, Ms. Sontag arranged for Plaintiff to meet with Dr. Tabet's nurse, who noted that Plaintiff complained that his Zyprexa was making him feel "sedated." *Id*. at 33.   Since Plaintiff had first been prescribed Zyprexa in September 2013 (*See Doc. 11-11* at 23), he had been taking it for six months at that time.[24]   However, Plaintiff reported that he had changed the dosage of his Zyprexa two weeks earlier, and was "doing much better" on the reduced dose.[25]   [*Doc. 11-14* at 33].

On April 3, 2014, Plaintiff attended appointments with both Dr. Tabet and Ms. Sontag. Dr. Tabet revised Plaintiff's evening Zyprexa dose, from two tablets to one tablet "as needed," stating:

> Cut back on his [Zyprexa] dose at night due to next day sedation about 1 month ago and doing better with this.   Reports overall he's doing better.   Feels psycho[therapy] has been helpful and moved his relationship with [girlfriend] forward, getting along better.   Exercising regularly, goes to a gym and trying to keep sleep/meal times regular.   "Hardly any paranoia", seeing things better in regards to suspiciousness.   Spends time helping [girlfriend] with her tasks,

---

[23] The notes from Plaintiff's "decompensation" visit to Beacon on September 11, 2013 indicate that he had been given a previous trial on the drug, Ambien (generic name zolpidem), but it had made him feel "hung over and groggy." [*Doc. 11-11* at 21].   However, that drug trial would have to have been well before Plaintiff's alleged disability onset date of September 14, 2012, since he had been on only Depakote and Klonopin for "many years" (*id*. at 36), and his records from both Idaho and New Mexico are devoid of Ambien prescriptions.

[24] This fact suggests that Plaintiff had been taking Zyprexa long enough to have reported any such side effects before he actually did, but not long enough for it to account for his claim of disability beginning in September 2012.

[25] Plaintiff had been instructed to take one tablet of Zyprexa every morning and two every night, but he reduced that dosage himself to one tablet every morning and one tablet every *other* night (*Doc. 11-14* at 33), which is a 50% decrease of the medication.

managing rental properties and dance class.   Sleeping ok but working on earlier bedtime.

*Id*. at 29.   Dr. Tabet's observations of Plaintiff's appearance speech, affect, thought process and content, and cognitive state were similar to other visits, and he noted that Plaintiff "appears on stable trend currently."   *Id*. at 29-30.   From her session, Ms. Sontag noted that Plaintiff "still appeared very depressed," but that "[h]e "says inside he feels better and was overall more communicative."   *Id*. at 27.   Ms. Sontag further noted that Plaintiff "wants to get a job and has taken active steps to find one," although she did not elaborate on what steps he had taken.   *Id*. at 27-28.

Three weeks later, Ms. Sontag reported that Plaintiff "seems to like his lifestyle and is able to be good with people so he doesn't have to isolate if he can get part-time work and develop enough skills to build his confidence."   *Id*. at 26.   She noted, however, that Plaintiff "hasn't applied for Voc[ational] Rehab[ilitation] yet.   *Id*.   In May 2014, she reported that Plaintiff "continues to have a flat affect all the time," and that "he is still unmotivated to look for [a job] or use the VA resources to get one."   *Id* at 24.   Nonetheless, Plaintiff's mood was "contented," and he reported that he and his girlfriend were "doing better."   *Id*.   In June 2014, Plaintiff's mood was "upbeat," despite an apparent increase in his suspiciousness of his girlfriend, and he "was open to looking into" some kind of Vocational Rehabilitation work program.   *Id*. at 22-23.   In July 2014, Ms. Sontag noted that Plaintiff was "stable now and has been for some time," but was not motivated to get a job, and was "unmotivated for any change at this time."   *Id*. at 21.   Plaintiff's "thought content was focused on how well things were going in his life because his [girlfriend] is happy."   *Id*.   Ms. Sontag further noted that Plaintiff "found reasons not to pursue any work situation and it was clear he didn't want to work if it wasn't necessary.   He says he sleeps a lot

with his meds and can't do much of anything including coming to the [Psychosocial Rehabilitation and Recovery Center]."[26]   *Id*.   Ms. Sontag scheduled Plaintiff for a Lifestyles recovery group session in August 2014, which he had indicated he would be willing to attend once a month.[27]   *Id*.

Plaintiff also saw Dr. Tabet in July 2014, indicating that things were "going better," and that he was "doing well," although his grandfather was ill and was expected to die soon.   *Id*. at 19. Plaintiff again reported that psychotherapy with Ms. Sontag "helped out quite a bit," and that he planned to attend group therapy.   *Id*.   Plaintiff also reported that he was "[g]oing to Isotopes [baseball] games," walked on a treadmill about twice a week, and "enjoys biking and may get a bike soon."   *Id*. at 19-20.   Dr. Tabet noted that Plaintiff's "stable trend continue[d]."   *Id*. at 20. Plaintiff next saw Dr. Tabet in October 2014, who noted that:

> [Plaintiff] reports overall is "doing ok" including mood [symptoms], suspiciousness (says no further problems at all in this area, doesn't check on [girlfriend] when she's away such as at work, and they have a described mutually supportive relationship).   [Plaintiff] stays busy, family supportive.   Grandfather died earlier this month as he'd expected, described him in very [positive] terms, helped raise [Plaintiff] and lived a [positive], inspiring life.

*Id*. at 15.   Dr. Tabet indicated that Plaintiff "remains on stable trend," and that he should return for follow-up in four months.   *Id*. at 16.

---

[26] The juxtaposition of these two statements suggests that Ms. Sontag interpreted Plaintiff's claim that he slept a lot because of his medications to be an "excuse" for not seeking employment, rather than a real problem for him.   Indeed, Plaintiff did not make this claim in any other session he had with Ms. Sontag.

[27] There is no indication in Plaintiff's records that he ever attended any Lifestyle group sessions, although such sessions may not be routinely documented.

Plaintiff's medical records clearly support the ALJ's conclusions that, while he does have a mood disorder, it is well controlled with medication, and that neither his symptoms nor his medications render him unable to function in a working environment.   The ALJ's determination of Plaintiff's RFC, which was based on Dr. Walker's consultative RFC,[28] is in fact more restrictive than the medical evidence appears to support.   Quite simply, despite the severe symptoms claimed by Plaintiff and his girlfriend, he failed to carry his burden to prove that he suffers from symptoms that preclude employment.   Rather, it appears that Plaintiff *prefers* to remain unemployed and be financially supported by his girlfriend.   Indeed, based on a thorough review of Plaintiff's medical records, the Court deems it unlikely that any of his treating medical sources would be willing to opine that he is even as impaired as he was found to be by the ALJ. Nonetheless, "if a medical opinion adverse to the claimant has properly been given substantial weight, the ALJ does not commit reversible error by electing to temper its extremes for the claimant's benefit."   *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).

---

[28] It is important to note that Dr. Walker's RFC analysis was signed by him on November 26, 2013 (*Doc. 11-4* at 11) and was adopted by Dr. Cave on February 25, 2014 (*id*. at 25), which means that the vast majority of medical records regarding Plaintiff's mental conditions did not exist and, therefore, were not available to either of those experts when they formulated their opinions.   By the time of the hearing in January 2015, however, all of the records discussed in this decision were a part of the record and were presumably considered by the ALJ.   *See* [*Doc. 11-3* at 29].

# VI.   Conclusion

For the reasons stated above, the Court FINDS that the Commissioner's decision is supported by substantial evidence and that the correct legal standards were applied.

**IT IS THEREFORE ORDERED** that Plaintiff's ***Motion to Reverse and Remand for a Rehearing with Supporting Memorandum*** (*Doc. 18*) is **DENIED** and the Commissioner's decision in this case is **AFFIRMED.**   A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**